IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 23 CR 212 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| ANDRE HOWARD JR. | ) | |

**MEMORANDUM OPINION & ORDER**

The court grants the motion to dismiss the indictment. (Doc. 54). In addition to having confronted these same issues in United States v. Prince, 700 F. Supp. 3d 663 (N.D. Ill. 2023), the court is also persuaded by the reasoning in United States v. Neal, 715 F. Supp. 3d 1084 (N.D. Ill. 2024) (Ellis, J.).[1]

The government offers two main arguments. First, the government argues that felons are not part of "the people" in the text of the Second Amendment and thus do not receive its protection. Second, the government argues that 18 U.S.C. § 922(g)(1) is consistent with this nation's historical traditions.

The court concludes, as it did in Prince, that felons are part of "the people" covered by the Second Amendment. Because "the Second Amendment's plain text covers [the defendant's]

---

[1] The court reached a similar result in several other cases, all of which, including Prince, are on appeal. See, e.g., United States v. Anderson, No. 23 CR 598, 2024 WL 1521449 (N.D. Ill. April 8, 2024); United States v. Hale, 717 F. Supp. 3d 704 (N.D. Ill. 2024); United States v. Eatman, No. 23 CR 518, 2024 WL 580001 (N.D. Ill. Feb. 13, 2024); United States v. Cook, No. 23 CR 595, 2024 WL 532351 (N.D. Ill. Feb. 9, 2024); United States v. Diaz, No. 20 CR 597, 2023 WL 8019691 (N.D. Ill. Nov. 20, 2023); United States v. Anderson, No. 22 CR 594, 2023 WL 7531169 (N.D. Ill. Nov. 13, 2023); United States v. Delaney, No. 22 CR 463, 2023 WL 7325932 (N.D. Ill. Nov. 7, 2023); United States v. Freeman, No. 23 CR 158, 2023 WL 7325934 (N.D. Ill. Nov. 7, 2023); United States v. Salme-Negrete, No. 22 CR 637, 2023 WL 7325888 (N.D. Ill. Nov. 7, 2023); United States v. Daniel, No. 20 CR 002, 2023 WL 7325930 (N.D. Ill. Nov. 7, 2023).

conduct, the Constitution presumptively protects that conduct." New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 17 (2022). The government urges the court to limit its reading of the Second Amendment's plain text to "law abiding citizens," a term that has been employed by the Supreme Court in its recent Second Amendment cases. See District of Columbia v. Heller, 554 U.S. 570, 635 (2008) (holding that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). But as the Seventh Circuit explained in United States v. Meza-Rodriguez, 798 F.3d 664, 669 (7th Cir 2015), a case predating Bruen, "[w]hile some of Heller's language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.' We are reluctant to place more weight on these passing references than the Court itself did." (Internal citation omitted).

In Bruen, the Court characterized petitioners as "law-abiding," but did not answer or purport to answer the question of whether "the people" in the Second Amendment are limited to law-abiding citizens. See Bruen, 597 U.S. at 31-32 (explaining that "[i]t is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects"). Thus, nothing in Bruen changes this court's understanding of the Seventh Circuit's holding in Meza-Rodriguez: "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights." Meza-Rodriguez, 798 F.3d at 670. See also United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990) (explaining that "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have

2

otherwise developed sufficient connection with this country to be considered part of that community").

Since felons are not categorically excluded from First or Fourth Amendment rights ascribed to "the people," it follows that felons are not categorically excluded from the protection of Second Amendment. See Meza-Rodriguez, 798 F.3d at 671 (explaining that "we see no hint" that a criminal record is a "relevant consideration" in whether someone can raise a Fourth Amendment claim); United States v. Calhoun, 710 F. Supp. 3d 575, 587 (N.D. Ill. 2024) (holding that "[s]ince felons are not excluded from First or Fourth Amendment rights, neither should they be excluded from Second Amendment rights, given the Framer's consistent use of the term 'the people' throughout.") (Internal quotations and citations omitted).

The court also concludes, as it did in Prince, that § 922(g)(1)'s permanent divestiture of the right to keep and bear arms lies beyond "the historical tradition that delimits the outer bounds of the right to keep and bear arms." Bruen, 597 U.S. at 19. Before addressing the government's historical analogues, the court echoes Judge Ellis's statement that "Bruen's approach has thrust the Court into a role for which it is ill-suited: playing historian." Neal, 715 F. Supp. 3d at 1090. That being said, as the Seventh Circuit explained in Atkinson v. Garland, 70 F.4th 1018, 1021, under Bruen, "[t]he proper inquiry, in short, turns on whether the modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Thus, this court's examination of historical regulations is guided by two factors, their justification and their burden.

The government's proposed historical analogues are largely the same as those the government offered in its briefing in Prince. In 17th century England, legislatures could disarm

3

classes of people, like Catholics and non-conformist protestants, and the 1689 English Bill of Rights enshrined Parliament's right to enact this sort of disarmament. In Colonial America, the American colonies disarmed classes of people whom the authorities believed could not be trusted to obey the law, such as religious minorities. During the Revolutionary War, some colonial governments disarmed those who refused to swear their allegiance to their state or the United States. During the ratification debates, language was proposed, but ultimately not adopted, that refused to extend the right to bear arms to criminals or otherwise non-peaceable citizens. Finally, under English law, the standard penalty for the commission of a felony was death and estate forfeiture.[2]

As this court held in Prince, "[t]his court is persuaded that the text, history, and tradition of firearm-dispossession statutes demonstrates that the legislature has the authority to categorically regulate firearm possession by individuals who have demonstrated that they cannot be trusted to obey the law, or pose some other danger to the political community if armed." 700 F. Supp.3d at 672. Nevertheless, "although the historical record discussed above demonstrates this nation's tradition of 'comparably justified' categorical dispossession statutes, the government has failed to meet its burden of providing evidence of a dispossession statute with a 'comparable burden' to § 922(g)(1)." Id. at 672-73. In short, the disanalogy between these

---

[2] The government also points to a history of laws disarming groups such as slaves, freed blacks, and Native Americans. The court observes that in the eyes of the law at that time, people belonging to these groups were, infamously, not considered part of "the people" protected by the Constitution. See Dred Scot v. Sandford, 60 U.S. 393, 404 (1857) (holding that "[t]he words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing….[and that black people] are not included, and were not intended to be included, under the word 'citizens' in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States"); Elk v. Wilkins, 112 U.S. 94, 112 (1884) (describing an Act of April 9, 1866 as "the first general enactment making persons of the Indian race citizens of the United States") (Harlan, J. dissenting). To the best of the court's knowledge, nor were they considered part of the political community that would eventually constitute "the people" in the historical era preceding ratification. Thus, any history of regulation that burdened these groups' rights to armed self-defense is not probative of the history and tradition of firearm regulation in this nation as to "the people" who enjoy the protections of the Constitution.

historical regulations and § 922(g)(1) is that the historical regulations, unlike § 922 (g)(1), allowed those deemed untrustworthy to regain their right to keep and bear arms by swearing an oath or renouncing their faith.

The government responds to the court's reasoning in Prince by arguing that § 922(g)(1) "does not disarm felons whose convictions have been pardoned or expunged, who have received executive clemency, or whose civil rights have been restored." This opportunity for restoration of rights, the government argues, bridges the gap between § 922(g)(1) and the historical regulations discussed above. The court disagrees. While the historical examples discussed above allowed those stripped of legal permission to keep and bear arms to regain that permission after undertaking an action within their own control—taking an oath of loyalty or renouncing their faith—the contemporary examples of pardon, expungement, etc. require government action beyond the control of those who were stripped of their right to keep and bear arms. Indeed, if someone is pardoned or has their conviction expunged, they are no longer convicted felons. Consequently, the burdens imposed by the historical regulations are not analogous to the lifetime burden imposed by § 922(g)(1).

Finally, on the example of disarmament through capital punishment and estate forfeiture, the government urges this court to reconsider the distinction it made in Prince between a "punishment" and a "consequence," because Bruen instructs courts to consider only whether a modern firearms regulation imposes a "comparable burden on the right of armed self-defense." 597 U.S. at 29. The court will take up the government's invitation to hone its analysis on the standard in Bruen.

The government argues that "[l]aws that subjected convicted felons to capital punishment

5

and estate forfeiture necessarily encompassed the permanent dispossession of firearms." Unlike the other historical examples discussed above, capital punishment and estate forfeiture presumably constituted a permanent burden because of the permanence of death. But the government's argument falsely equates the "permanent dispossession of firearms" with a "burden on the right of armed self-defense." A dead person cannot, as a matter of physical fact, engage in self-defense. Thus, the inability of a dead person to possess a firearm—because dead people cannot possess things—imposes no "burden on the right to armed self-defense." The government provides no sources indicating that felons were subject to capital punishment for the purpose of or as a means of dispossessing them of arms. Instead, the government offers the far too clever argument that the fact of death permanently deprives one of the ability to possess arms. This is literally true. But it is the same fact of death that permanently deprives one of the ability (or need) to engage in self-defense. Consequently, the court finds that laws authorizing capital punishment and estate forfeiture do not impose a "comparable burden on the right of armed self-defense" to § 922(g)(1).

Because this court determines that defendant is a member of "the people" protected by the Second Amendment, and because the historical regulations offered by the government do not satisfy its burden to show a history and tradition of relevantly similar analogues to § 922(g)(1)'s permanent, categorical firearm dispossession of all felons, the court grants defendant's motion to dismiss the indictment against him.

6

**CONCLUSION**

For the above reasons, defendant's motion to dismiss the indictment (Doc. 54) is GRANTED.

        **ENTER:**

        _____
        Robert W. Gettleman
        United States District Judge

**DATE:** April 25, 2025